[No. B176354. Second Dist., Div. Three. Oct. 18, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
EDUARDO TOLENTINO RODRIGUEZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part 2(c) of the Discussion.

## Counsel

A. William Bartz, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Jeffrey B. Kahan and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**KITCHING, J.**—Eduardo Tolentino Rodriguez appeals from the judgment entered following his convictions by jury of four counts of presenting fraudulent claims (Ins. Code, § 556, subd. (a)(1); counts 1, 3, 5, and 7)[1] and one count for grand theft of personal property (Pen. Code, former § 487, subd. 1; count 2). He was sentenced to prison for three years and eight months.

The primary issue in this case is whether a jury can compare an exemplar of a defendant's handwriting with handwriting on disputed documents to determine if the defendant signed the disputed documents.

We hold that the jury, under Evidence Code section 1417, was entitled to compare the signatures and, based on that comparison, a jury reasonably could have concluded, beyond a reasonable doubt, and without the benefit of testimony from a handwriting expert, that the questioned signatures were made by appellant.

### FACTUAL SUMMARY

1. *The Metropolitan Life Insurance Claim (Count 5).*

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence, the sufficiency of which is undisputed except as to the issue of identity, established that on August 27, 1985, a person named Eduardo Tolentino Rodriguez knowingly presented to Metropolitan Life Insurance

---

[1] The information alleged, as to counts 1, 3, 5, and 7, that appellant committed violations of *Penal* Code former section 556, subdivision (a)(1). Appellant was convicted of those charges. Appellant concedes those allegations were erroneous and that, in 1985, the offenses were violations of *Insurance* Code section 556, subdivision (a)(1). Although appellant claims that Insurance Code section 556, subdivision (a)(1), was superseded by Penal Code section *550*, and that the latter section is the appropriate charging section, the appropriate section is the one that applied at the time of his 1985 offenses, that is, Insurance Code former section 556, subdivision (a)(1). We will modify the judgment accordingly. (*People v. Thomas* (1987) 43 Cal.3d 818, 826 [239 Cal.Rptr. 307, 740 P.2d 419].)

(Metropolitan) a fraudulent claim for the proceeds of a $400,000 life insurance policy in which Imelda Rodriguez (Imelda) was the insured. Rodriguez[2] presented the claim knowing Imelda was alive. (Count 5.)

Rodriguez presented the claim through his attorney George Savin. Savin testified that "Eduardo Tolentino Rodriguez" retained Savin in August 1985. On August 26, 1985, "Eduardo T. Rodriguez" signed a Metropolitan claimant's statement (People's exhibit No. 28).[3] On August 27, 1985, Savin had Rodriguez sign a notarized power of attorney (exhibit 22) so Savin could handle the Metropolitan matter. The authorization is signed with a scrawl, but the notary indicated the signature was that of "Eduardo T. Rodriguez" (some capitalization omitted).[4] On August 27, 1985, Rodriguez also signed a notarized document (exhibit 30) authorizing Metropolitan to obtain medical information pertaining to Imelda in order to process the claim. The authorization is signed with a scrawl, but the notary indicated the signature was that of "Eduardo T. Rodriguez" (some capitalization omitted).[5]

Norman MacRae, a claims investigator, investigated the claim on behalf of Metropolitan. He met Rodriguez once at Savin's office. MacRae recorded in a written statement what Rodriguez told MacRae concerning how Imelda allegedly had died. Rodriguez signed the statement (exhibit No. 29); the signature is a scrawl representing "Eduardo T. Rodriguez." The exhibit lists his address as 17000 Tennyson Place, Granada Hills, California. MacRae witnessed Rodriguez's signature, and MacRae signed the statement. MacRae could not identify appellant at trial.

### 2. The Allstate Claim (Count 7).

On September 3, 1985, a person named Eduardo T. Rodriguez knowingly presented to Allstate Insurance (Allstate) a fraudulent claim for the proceeds of a $400,000 life insurance policy in which Imelda was the insured, even though Rodriguez knew Imelda was alive. (Count 7.) Rodriguez presented the claim through Savin. The claim (exhibit No. 23) was signed by Rodriguez on September 3, 1985, and lists his address as the above mentioned Tennyson

---

[2] We use the name "Rodriguez" *post* to refer to insurance claimant "Eduardo Tolentino Rodriguez," "Eduardo T. Rodriguez," and/or "Eduardo Rodriguez" as context dictates, mindful that the issue on appeal is whether *appellant* is "Rodriguez."

[3] References below to exhibits and numbers are to People's exhibits and their numbers.

[4] The notary, Ken Kaitschuck, stated, in pertinent part, "On this 27th day of August, in the year 1985, before me, the undersigned, a Notary Public in and for said State, personally appeared Eduardo T. Rodriguez personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument, and acknowledged to me that he executed it."

[5] Kaitschuck, the notary, stated, in pertinent part, "On this 27th day of August 1985 personally appeared before me the above-named Eduardo T. Rodriguez to me known, and duly acknowledged to me that he executed . . . the above."

Place address. The signature is a scrawl representing "Edwardo T. Rodriguez." The claim is also signed by Savin as a witness.

Savin personally met Rodriguez during the course of Savin's representation of him. Rodriguez gave Savin a copy of Imelda's alleged death certificate and a police report. On August 27, 1985, Savin had Rodriguez sign the previously mentioned notarized power of attorney (exhibit No. 22) so Savin could handle the Allstate matter (in addition to the Metropolitan matter).

Savin later became suspicious of Rodriguez's claims and withdrew as counsel. At trial in November 2003, Savin could not identify appellant, but testified that appellant looked familiar and his appearance was consistent with that of Rodriguez. MacRae investigated the claim on behalf of Allstate, and had appellant sign and submit exhibit No. 29, which pertained to the Allstate claim (as well as to the Metropolitan claim).

> 3. *The National American Life Insurance Claim and Payment (Counts 1 and 2).*

On September 3, 1985, a person named Eduardo Rodriguez knowingly presented to National American Life Insurance (National) a fraudulent claim for the proceeds of a $100,000 life insurance policy in which Rodriguez was beneficiary and his wife, Imelda, was the insured, even though Rodriguez knew Imelda was alive. (Count 1.) The initial policy application was signed by Imelda on July 11, 1985, and she indicated on the application that she lived at 17000 Tennyson Place in Granada Hills.

Miller Stroup, a claims adjuster for National, processed the claim. Attorney Sheila Singer was Rodriguez's attorney. Stroup asked Singer to acknowledge that Singer was the attorney for Rodriguez. Singer had Rodriguez sign, on September 3, 1985, a document (exhibit No. 4). The signature is a scrawl above the name "Eduardo Rodriguez." The document authorizes Singer to handle all matters regarding Rodriguez's claim with National. Stroup received that document and also received a claimant's statement signed on September 3, 1985, by Rodriguez (exhibit No. 5). The signature is a scrawl above the name "Eduardo Rodriguez" (some capitalization omitted), and lists his address as the above mentioned Tennyson Place address. Stroup also received a copy of an alleged Philippines death certificate (exhibit No. 6), reflecting the alleged death of Imelda. The copy reflects Rodriguez's signature, dated July 27, 1985, as that of the informant. The signature is a scrawl above the name "Eduardo T. Rodriguez" (some capitalization omitted).

National honored Rodriguez's claim and made a $100,000 payment to him. (Count 2.) The check was dated September 13, 1985, and was probably sent

on that date. The check, made payable to Rodriguez, would have been sent to Singer. The check was negotiated. Singer had been instructed to deposit the check in Rodriguez's bank account when Singer received the check. Singer testified that she remembered depositing the check in a bank. Singer testified the check was not endorsed and "[i]t was just . . . a stamp deposit to the account of [the] payee."[6] Stroup did not think he had ever seen appellant before the date of trial.

### 4. *The Reliance Claim (Count 3).*

On September 11, 1985, a person named Eduardo Rodriguez knowingly presented to Reliance Standard Life Insurance (Reliance) a fraudulent claim for the proceeds of a $150,000 life insurance policy in which Imelda was the insured, even though Rodriguez knew Imelda was alive. (Count 3.) Singer assisted Rodriguez in processing the claim.

Rodriguez signed, on September 4, 1985, a document (exhibit No. 12) authorizing Singer to handle the Reliance claim. Rodriguez also signed, on September 10, 1985, a Reliance claimant statement (exhibit No. 13) which lists his address as the above mentioned Tennyson Place address. As to each of exhibits Nos. 12 and 13, the signature is a scrawl above the name "Eduardo Rodriguez" (some capitalization omitted). On October 15, 1985, Rodriguez signed a document (exhibit No. 16) authorizing Reliance to obtain medical information pertaining to Imelda. The authorization is signed "Eduardo T. Rodriguez." Singer later learned the claim was fraudulent. Singer did not, at trial, identify Rodriguez, but knew Rodriguez was Filipino.

Lawrence Odel investigated Rodriguez's claim to Reliance. On October 15, 1985, Odel had Rodriguez sign a written statement (exhibit No. 32) concerning how Imelda allegedly had died. The statement was signed, "Eduardo Rodriguez," and lists his address as the above mentioned Tennyson Place address. Odel did not testify that appellant was Rodriguez.

### 5. *Additional Evidence.*

California Department of Insurance Investigator Kenneth Kensler was assigned to investigate the present matter in the latter part of 1985 or early

---

[6] During cross-examination, Stroup testified he became aware that there was a problem with the claim when someone told him that appellant had been arrested and jailed in Los Angeles. Stroup testified there was no extradition treaty with the Philippines so "there wasn't anything we could do once he made bail and went back." Stroup had no independent knowledge that appellant had been arrested, and the information someone told him could have been false. However, Stroup testified he did not think the information was false "because a couple of years later there was an article in the Wall Street Journal that talked about this claim." (Original underlining omitted.)

1986. He identified exhibit No. 31. That exhibit purports to be a copy of the California driver's license of Eduardo Tolentino Rodriguez, containing his signature and photograph, and listing his address as 17000 Tennyson Place, Granada Hills, California. The signature is a scrawl. Kensler referred to exhibit No. 31 as a "Soundex" from the Department of Motor Vehicles (DMV). Kensler later explained that a request for information would be made through "Soundex," but the photographs on the exhibit were sent to him by DMV.

During the direct examination of Kensler, the prosecutor indicated that Rodriguez had listed one or more residence addresses on his claim applications, and listed the above mentioned Tennyson Place address on his driver's license. The prosecutor then asked if Kensler had been able to locate Rodriguez at an address, apparently the Tennyson address, but Kensler replied he was not. At some point in 1985, Kensler went to an apartment complex at 17819 Merridy Street in Northridge, and obtained a copy of a lease (exhibit No. 33) reflecting that Rodriguez was leasing an apartment there. The lease is signed with a scrawl, representing "Eduardo T. Rodriguez," and lists his address as the above mentioned Tennyson Place address.

California Department of Insurance investigator Michael Ingram testified that in November 1985, he and his partner went to an apartment complex at 17819 Merridy Street in Northridge. Once there, Ingram located Imelda, and Ingram and his partner identified themselves as police officers. Imelda fled but Ingram and his partner pursued and arrested her. Imelda provided a false name and tried to bribe Ingram and his partner to release her.

On November 21, 2003, the parties stipulated that "the defendant, Eduardo Tolentino Rodriguez, is married to Imelda Dener Rodriguez"; that she was alive at the time of trial; and appellant and his wife lived in the Philippines since late 1985. The parties also stipulated that, following her arrest, Imelda posted bail, failed to appear in court, and a warrant was issued for her arrest. All of the above discussed exhibits were admitted in evidence without objection. Appellant presented no defense evidence.

## CONTENTION

Appellant contends there was insufficient evidence to support his convictions. He argues, inter alia, that, absent testimony from a handwriting expert, the jury could not properly compare appellant's signature on his driver's license with questioned signatures on the claims and related documents to conclude the latter signatures were made by appellant. He also argues such a comparison by the jury was impermissible because the trial court made no foundational finding as to the existence of the preliminary fact of the genuineness of the signature on the driver's license.

## *DISCUSSION*

*Sufficient Evidence Supported Appellant's Convictions.*

### 1. *Pertinent Facts.*

The People were required at trial to rely on documentary evidence in their efforts to prove appellant committed the present offenses, because he left the country in late 1985 to live in the Philippines, and any memory of witnesses as to the culprit's appearance naturally would have diminished over time.

Appellant conceded during jury argument that in 1985, Imelda and another person attempted to defraud the insurance companies, but appellant denied he was the person and denied he received the $100,000 payment. Moreover, appellant's counsel urged to the jury that the scrawls on exhibits Nos. 4, 5, 6, 12, 14, 23, 29, 30, 31 (the driver's license), and 33 were somewhat similar, but the signatures on exhibits Nos. 28 and 32 were "completely different than other signatures."

### 2. *Analysis.*

Appellant contends that the jury could not compare an exemplar of appellant's signature with signatures on disputed documents to determine if appellant signed the disputed documents. We disagree.

#### (a) *Pertinent Law.*

Evidence Code section 1417, states, "The genuineness of handwriting, or the lack thereof, may be proved by a comparison made by the trier of fact with handwriting (a) which the court finds was admitted or treated as genuine by the party against whom the evidence is offered or (b) otherwise proved to be genuine to the satisfaction of the court."

Although it concerned a will contest, the case of *Estate of Nielson* (1980) 105 Cal.App.3d 796 [165 Cal.Rptr. 319] (*Nielson*), held that expert testimony was not necessary to authenticate handwriting. There the court stated, "Where the issue is the questioned authorship of a will, the trier of fact can determine the issue by comparison of the questioned writing with 'genuine' or admitted handwriting of the testator without the aid of the oral testimony of any witness. (Evid. Code, § 1417; [citations].) Thus, no handwriting expert or testimony was necessary. The court—the trier of fact—had the testator's admitted handwriting before it in the proffered will. It was authorized by law to determine the authenticity of the 'questioned handwriting by comparison' with the conceded handwriting of the testator." (*Nielson, supra,* at p. 801.)

For purposes of the Evidence Code, the phrase "[t]rier of fact" includes a jury (Evid. Code, § 235), and Evidence Code section 1417 applies to civil and criminal actions alike. (Evid. Code, §§ 105, 300.) Nonetheless, we have not found a published criminal case that relies on Evidence Code section 1417 to hold that a *jury* may compare an exemplar of a defendant's signature with a signature on a questioned document and then conclude that the latter signature is that of the defendant. However, criminal cases relying on former Code of Civil Procedure section 1944,[7] the predecessor of Evidence Code section 1417, do so hold.

In an early case decided by this division, *People v. Weiskopf* (1943) 60 Cal.App.2d 214 [140 P.2d 201] (*Weiskopf*), the defendant challenged the sufficiency of the evidence that she forged someone's name. (*Id.* at p. 216.) We reasoned a jury could compare the defendant's signature and a signature on an affidavit of birth, and conclude the latter signature belonged to her. We stated, "the jury had before them a proven specimen of defendant's genuine handwriting, and were authorized to make their own comparison of this handwriting with that appearing on the affidavit. (Code of Civ. Proc., sec. 1944; [citations].)" (*Weiskopf, supra,* at p. 218.)

In *People v. Driggs* (1910) 14 Cal.App. 507 [112 P. 577] (*Driggs*), the defendant challenged the sufficiency of evidence that she forged a lease. (*Id.* at pp. 509–510.) Experts compared the lease and defendant's exemplars. (*Id.* at p. 509.) As an independent ground for rejecting the sufficiency challenge, *Driggs* concluded that the exemplars were properly submitted to the jury for comparison with the lease. *Driggs* stated, "When the court was satisfied that the exemplars offered were genuine, it was proper to submit the same to the . . . jury for comparison. (Code Civ. Proc., sec. 1944.) When so submitted and in evidence, a comparison may be made by the jury with or without the aid of experts. [Citation.] The *weight and effect of the* opinion of experts, or the *results of comparisons, was a matter for the jury. . . .* After an examination of the various exhibits which are on file in this court, we feel able to say that no reasonable doubt can exist as to who wrote the signature upon the lease." (*Driggs, supra,* at p. 510, italics added.)

In *People v. Chapman* (1957) 156 Cal.App.2d 151, 158–159 [319 P.2d 8], the defendant challenged the sufficiency of evidence that he forged endorsements on three checks. (*Id.* at pp. 154, 158–159.) *Chapman* concluded the jury was entitled to compare an exemplar (a check indisputably written by the

---

[7] (Code of Civ. Proc., former § 1944, repealed by Stats. 1965, ch. 299, § 101, p. 1362, operative Jan. 1, 1967.) Code of Civil Procedure former section 1944, provided, "Evidence respecting the handwriting may also be given by a comparison, made by the witness *or the jury,* with writings admitted or treated as genuine by the party against whom the evidence is offered, or proved to be genuine to the satisfaction of the judge." (Italics added.)

defendant) to the endorsements, stating, "The jury may properly compare handwritings to determine similarity or dissimilarity without the testimony of a handwriting expert. [Citations.] [¶] . . . Thus defendant's felonious connection with these checks is sufficiently established, and the jury could reasonably find that defendant passed each of the three checks as genuine . . . ." (*Id.* at p. 159.)

*People v. Vance* (1956) 138 Cal.App.2d 871 [292 P.2d 552] (*Vance*), involved a third party's signature. In that case, a defendant was convicted of attempted car burglary. He was found in possession of a signed card taken from the car. The car's owner submitted an exemplar for comparison with the signature on the card, and the defendant complained on appeal that an expert had not conducted the comparison. *Vance* rejected the complaint, noting, "Comparison of handwriting by the jury is a method recognized and prescribed by Code of Civil Procedure, section 1944." (*Vance, supra,* at p. 874.)

■ We conclude that under Evidence Code section 1417, the jury may determine that a criminal defendant signed a document by comparing the handwriting on a questioned document to an authenticated exemplar of the defendant's handwriting.

(b) *Application of Law to the Facts of This Case.*

There is no dispute *someone* committed the crimes of which appellant was convicted. Nor is there any dispute that the culprit signed the name "Eduardo Rodriguez" or "Eduardo T. Rodriguez," sometimes using a scrawl, to make the false claims at issue and receive the $100,000 payment from National.

Appellant concedes exhibit No. 31 was *appellant's* driver's license, containing his signature and photograph; that is, he concedes the driver's license was an exemplar. For example, appellant urges in his opening brief that "the only evidence that the government relied on in obtaining the conviction of appellant was asking the jury to compare the signature on appellant's driver's license to the signature on the insurance claim forms." His opening brief also states that "[Department of Insurance investigator] Kensler . . . procured a copy of appellant's California driver's license." Appellant later urges that it was inappropriate for the jury to "compare the signature on appellant's driver's license with the signature on the insurance claims forms." His reply brief argues "What this case comes down to is the jury comparison of the signature on appellant's driver's license to the signature on the insurance claim forms." While discussing the driver's license and signature thereon, his reply brief also claims that the jury's comparison was improper because of a lack of foundation concerning the "exemplar."

The People's exhibits have been transmitted to this court, and we have inspected them. Appellant's signature on his driver's license is a scrawl. That

scrawl is substantially similar to the scrawls on the other exhibits previously mentioned. Certainly the jury reasonably could have concluded, beyond a reasonable doubt, that the scrawls were substantially the same and that appellant made all of them, and we so hold. Thus, whenever that scrawl appears on an exhibit other than the exemplar, the scrawl provides substantial evidence that appellant signed that exhibit. Accordingly, we discuss below the sufficiency of the evidence as to each count, relying in part on the scrawl as substantial evidence that appellant signed the exhibit on which the scrawl appears. Where exhibits are referred to in our discussion below, they were admitted in evidence to prove the count(s) at issue in that discussion.

### (1)  *The Metropolitan Claim (Count 5).*

As to count 5, the above mentioned scrawl appears on exhibits Nos. 22, 29, and 30, and this fact alone provided sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, that appellant signed those exhibits pertaining to the Metropolitan claim. Moreover, the signatures on exhibits Nos. 22 and 30 were notarized. Contrary to appellant's suggestion that someone posed as him and forged those scrawls, the notary attested that the person who signed the scrawl on each of those two documents not only signed each as Eduardo T. Rodriguez, but was *in fact* Eduardo T. Rodriguez (see fns. 4 and 5, *ante*). Thus, the jury was entitled to compare the undisputedly genuine scrawl of appellant on his driver's license with the notarized scrawl attested as genuinely signed by Eduardo T. Rodriguez on those two documents.

Further, exhibit No. 29 reflects Rodriguez's address as 17000 Tennyson Place, Granada Hills, California, the same address listed on appellant's driver's license. Further still, Savin testified that "Eduardo *Tolentino* Rodriguez" (italics added) retained Savin to represent him on the Metropolitan claim, and appellant's driver's license reflects that name. It is a sufficiently uncommon name that the identity of name provides sufficient evidence of identity of the person. (Cf. *People v. Mendoza* (1986) 183 Cal.App.3d 390, 400–401 [228 Cal.Rptr. 308] [and cases cited].)

### (2)  *The Allstate Claim (Count 7).*

As to count seven, the above mentioned scrawl appears on exhibits Nos. 22, 23, and 29. Moreover, as mentioned, exhibit No. 22 was notarized, which enhances the sufficiency of the evidence. Further, exhibits Nos. 23 and 29 reflect Rodriguez's address as the Tennyson Place address, the same address listed on appellant's driver's license.

### (3)  *The National Claim and Payment (Counts 1 and 2).*

As to count 1, the above mentioned scrawl appears on exhibits Nos. 4 and 5. Moreover, since, as we have held above, the jury reasonably could have

concluded that appellant was guilty of counts 1, 5, and 7, and since, as we hold below, the jury reasonably could have concluded appellant was the person who committed count 3, the jury also reasonably could have concluded that appellant committed count 2 and received the payment from National.

### (4) *The Reliance Claim (Count 3).*

As to count 3, the above mentioned scrawl appears on exhibits Nos. 12 and 13. Moreover, exhibit No. 13 reflects Rodriguez's address as the Tennyson Place address, the same address listed on appellant's driver's license.

Further, we already have concluded there was sufficient evidence that appellant committed count 5 involving the Metropolitan claim. Exhibit No. 28 was admitted in evidence to prove that count, and that exhibit contains the signature "Eduardo T. Rodriguez." Therefore there was sufficient evidence that appellant made that signature. The signature "Eduardo T. Rodriguez" also appears on exhibits Nos. 16 and 32, exhibits pertaining to the Reliance claim, and a jury reasonably could have concluded, by comparing the signatures on the above three exhibits, that the signatures on them were made by the same person.

We hold there was sufficient evidence that appellant committed the crimes of which he was convicted in counts 1, 2, 3, 5, and 7, including sufficient identification evidence that he was the person who signed and submitted the fraudulent insurance claims at issue and stole the $100,000 from National. (Cf. *People v. Ochoa, supra,* 6 Cal.4th at p. 1206.)

### (c) *None of Appellant's Arguments Compel a Contrary Conclusion.*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## CONCLUSION

We conclude that there was sufficient evidence that appellant committed the offenses of which he was convicted. There was also sufficient evidence of appellant's identity. That identification evidence includes appellant's driver's license bearing his signature. Comparing appellant's authenticated signature with the questioned signatures, the jury reasonably could have concluded that appellant signed the insurance claims and related documents.

---

[*] See footnote, *ante,* page 545.

## DISPOSITION

The judgment is modified to reflect that, as to each of counts 1, 3, 5, and 7, appellant was convicted of a violation of Insurance Code section 556, subdivision (a)(1). As so modified, the judgment is affirmed. The trial court is directed to forward to the Department of Corrections an amended abstract of judgment reflecting the above modification.

Klein, P. J., and Croskey, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 1, 2006, S139151. Chin, J., did not participate therein.